27 C.C.P.A. (Patents)

## RAYMOND et al. v. WICKERSHAM.

### Patent Appeal No. 4290.

Court of Customs and Patent Appeals.

April 8, 1940.

R. Welton Whann, of Los Angeles, Cal. (Jennings Bailey, Jr., of Washington, D. C., of counsel), for appellants.

Mark L. Herron, of Los Angeles, Cal. (Robert E. Barry and Armand A. Cyr, both of Washington, D. C., of counsel), for appellee.

Before BLAND, acting Presiding Judge, and HATFIELD, LENROOT, and JACKSON, Associate Judges.

BLAND, Associate Judge.

This is an appeal by Edward F. Raymond and his exclusive licensee, Ira J. McCullough, from the decision of the Board of

Appeals of the United States Patent Office, affirming that of the Examiner of Interferences in awarding priority of the invention defined in ten counts of an interference, relating to an oil well tool known as a jar, to Harry P. Wickersham.

The so-called jar is used for the purpose of unloosening, by means of an "upwardly directed hammer blow" or jar, pipe and other objects which become fastened in an oil well which is being or has been drilled. The jarring tool is interposed in a string of drill pipe, to the bottom of which a fishing tool has been affixed. The fishing tool grapples or otherwise engages the object to be removed which is known as a fish. The jar is so devised that upon the drill pipe being given certain motion a quick jar or stroke will be administered to the fish so that it may be loosened thereby.

Claims corresponding to the counts which define the invention involved, and which will not be set out or analyzed here, were copied into the application of Wickersham filed March 20, 1931, and were taken from the application of Raymond filed May 23, 1933. Wickersham is thus seen to be the senior party and Raymond the junior party.

On June 18, 1935, priority was awarded by the Examiner of Interferences to Wickersham on the record following Raymond's failure to take testimony. This finding was vacated to permit the taking of testimony by both parties, which was done.

Raymond's preliminary statement claimed conception in January, 1929, the construction of a full-sized device embodying his invention in November, 1930, and that "said device was first successfully tested" in Bakersfield, Kern County, California, in November, 1930. Wickersham's preliminary statement claimed conception in February, 1930. His filing date—March 20, 1931—is relied upon for constructive reduction to practice, the dates for actual reduction to practice alleged in his preliminary statement being after his filing date.

The test given at Bakersfield is not seriously relied upon by Raymond except for conception, probably on account of the nature of the test given the device at that time. Raymond claims that the original testimony showed that subsequent to the Bakersfield test the jar came into the possession of the Shull Perforating Company on April 13, 1931; that some time after that date a party by the name of Lundberg —a stranger to Raymond—obtained the device from that company and soon thereafter took the same to a well known as the Acme No. 1, in the town of Venice, near Los Angeles; that it was there used during the latter part of April or the first of May in removing a fish, and that three or four days after the completion of this work it was taken across the street and successfully used on the Bradley-King No. 1 well.

The Examiner of Interferences held that Raymond was the first to conceive, awarding him a conception date of at least as early as October, 1930 (this date is undisputed here); that he reduced his invention to practice in April, 1931; and that he was diligent from a time prior to Wickersham's entering the field shortly after February 2, 1931 (this being the date given to Wickersham for conception) until he (Raymond) reduced his invention to practice in April, 1931, as aforesaid.

While appellants contend that the jar in controversy was not invented by Wickersham but by a stranger to this interference, and therefore contend in effect that Wickersham should be awarded no conception date, the date awarded him by the Examiner of Interferences—February 2, 1931—is not otherwise disputed.

Judgment was entered in favor of Raymond by the Examiner of Interferences. Wickersham appealed to the Board of Appeals where the main issues presented were that Raymond was not diligent in reducing the device to practice; that Lundberg who tested the jar was not authorized to test it, and that the test was insufficient to show that the jar would accomplish the result for which it was designed. The Board of Appeals affirmed the decision of the Examiner of Interferences.

Various circumstances had aroused the suspicions of Wickersham and a thorough investigation was instituted with relation to the tests alleged to have been made on the Acme and Bradley-King wells. Before the decision of the board became final, Wickersham filed a petition and numerous affidavits for the purpose of obtaining a reopening of the case in order that newly discovered evidence might be submitted. Raymond filed counter-affidavits and resisted the granting of the petition.

Among the affidavits submitted with Wickersham's petition to reopen was that of Lawrence F. Baash, president of the Baash-Ross Tool Company, which company was at that time and now is the licensee of Wickersham, in which it is stated that

Raymond had an interview with Baash and complained that he had not been treated fairly by his licensee McCullough, and stated that: "* * * he could have the Raymond-Wickersham interference thrown in favor of Wickersham but that to do that he would have to go to the pen [penitentiary] and it would be no comfort that he would take Whann [his attorney] and McCullough with him because he didn't like the company of either of them."

After the reopening, Baash testified to the same effect and his testimony was corroborated by Erwin Burns, vice-president and general manager of the Baash-Ross Tool Company. While no affidavit was sworn to by Raymond countering those filed by Wickersham in connection with the motion to reopen, Raymond did deny making said remarks in his testimony heard at a later date.

Other affidavits, submitted with the petition to reopen, were to the effect that the Bradley-King well had been shut down in February, 1931; that no operations had taken place at this well subsequent to that date; and that a quitclaim deed had been made, transferring back to the original owners on February 26, 1931, the land on which the well was drilled. The log of the drilling operations of the Acme well was discovered and a photostatic copy thereof was submitted with the affidavits, which log shows that operations on that well were discontinued on April 12, 1931, about the time at which Lundberg claimed to have obtained, and according to employees of the Shull Perforating Company did obtain, some kind of well jar which Lundberg stated was the one in controversy.

The motion to reopen the case was granted by the Examiner of Interferences and the following is quoted from the order made: "* * * the motion to reopen is granted, but only for the purpose of determining whether or not the Raymond jar embodying the invention was, or could have been, used on the Acme No. 1 well and the Bradley-King No. 1 well after April 13, 1931. * * *"

After the testimony of Wickersham and that of Raymond and his exclusive licensee, Ira J. McCullough, was submitted, the Examiner of Interferences awarded priority of invention to Wickersham, thus in effect reversing his former decision, and the Board of Appeals affirmed this latter decision of the Examiner of Interferences and appellants appealed here.

Upon the case being reopened there was no further contention on the part of appellants or their witnesses that the jar was ever used on the Bradley-King well. It is admitted in appellants' brief that the jar was not and could not have been so used.

In connection with the testimony taken after the case was reopened, there was submitted a report on the Acme well made to the State Oil and Gas Supervisor, showing that the Acme well had been shut down on April 12, 1931. It is claimed by appellants, and the record to some extent supports the contention, that those responsible for reporting on the Acme well to the state officials did not state all the facts correctly and omitted to disclose certain difficulties that were being encountered with the well while it was being drilled and that the facts were not correctly reported for the reason that it might affect the obtaining of money with which to continue the drilling operations.

Records were submitted showing that no gas had been supplied to the Acme well after April 12, 1931; that the consumption of electricity ceased some time between April 10 and May 11, and that the consumption of water ceased some time between April 1 and May 1. It is appellants' contention that steam to perform the alleged jarring operations was available from the Hampton well, the boiler of which was connected with that of the Acme well. The record does not show that such steam was used. The Examiner of Interferences pointed to the water and electricity records as not being inconsistent with the records which indicated that the Acme well had shut down April 12, 1931.

One of the affidavits accompanying Wickersham's petition to reopen was by Arthur D. Thompson. Thompson, as a witness for Raymond, had originally testified positively as to the use of the jar on the Acme well in April, 1931, just before the well was shut down. He, at the request of counsel for Wickersham, prepared and checked an affidavit which was executed before a notary public. The gist of the affidavit is to the effect that what he had originally testified to had been erroneous. He later, at the request of counsel for Raymond's exclusive licensee, McCullough, filed a recanting affidavit changing in part

the statements he had made in the affidavit submitted by Wickersham with the petition for reopening the case. The first affidavit stated that all the jarring done by any jar whatsoever on the Acme well was done before it was "shut down on November 30, 1930," and before he filed a claim for his wages for the period between February 1, 1931, and March 4, 1931. This affidavit showed that no jarring was done with jars of any type after March 26, 1931. His recanting affidavit stated that: "It is still my recollection of the facts that the torque type of jar, about which I testified in detail on July 25, 1935, was used to perform jarring operations during the latter part of April, 1931, * * *" and that the pipe that was taken out of the well at that time was taken out by the torque type of jar, being the kind involved in this proceeding, and not by the Axelson or "Beck" jar which is of a different type. He changed the statements made in the first affidavit in several different particulars. All the details need not be given in view of our conclusion as to his testimony as a whole. He intimated that all the log of the Acme well had not been found and it is the position of appellants' counsel here that an entry which was made in the log under date of April 12 by lead pencil shows some evidence of erasure, and it is claimed that the word "whipstock" must have been inserted instead of "bit stuck." The record discloses no evidence of any tampering with the log and the testimony on the whole indicates that it was not tampered with. In Thompson's second affidavit he claimed that he had been drinking when he signed the first affidavit and that he did not remember making many of the statements which were made therein.

Concerning these matters and the force to be given the testimony of the witnesses of Wickersham in this connection, the Examiner of Interferences said: "As for Thompson, it is apparent that he not only admitted he was wrong when he was confronted with the documentary evidence but actually executed an affidavit, Exhibit X–47, to that effect. His attempts to avoid the effect of that prior sworn statement in a recanting affidavit by insinuations concerning his condition at the time is not only controverted by the testimony of Daniel Crane and Mr. Herron, but by those present when the original affidavit was prepared and executed. The account given by the witnesses for Wickersham has not been satisfactorily controverted and is believed to give the true account of what happened."

In the surrebuttal testimony given on behalf of Raymond, he, his wife, and C. G. Stratton testified. In the surrebuttal testimony given on behalf of Raymond's exclusive licensee, McCullough, witnesses Bargion, Cedermalm, Ellis, Erwin, Flury, George W. Hall, Jesse E. Hall, Jewell, Jones, Lewis, Loftin, Lundberg, Maxwell, Robinson, Schneider, Thompson, Van Tassell and Mrs. Van Tassell testified.

Lundberg, the main witness for appellants, who testified positively and in detail, when the original testimony was adduced, that the Raymond jar was taken by him and used on the Acme well and later on the Bradley-King well, in substance denied, in the surrebuttal testimony, after much equivocation and attempted evasion, that the jar could ever have been used on the Bradley-King well. He had been shown the quitclaim which he executed in February, 1931.

Mark L. Herron, attorney for Wickersham, and D. L. Crane both testified that Lundberg admitted to them that the jarring on the Acme well was done before the first shutdown and that his, Lundberg's, testimony was wrong because the jar was a Beck jar and that he stated he was willing to give an affidavit to that effect but that he desired to see his attorney first. The affidavit was not made.

In his testimony on surrebuttal Lundberg denies much of that which he had previously stated and that which certain witnesses reported him to have said. He testified that he brought the jar to the Acme well some time after April 12, 1931, and that Art Thompson ran the jar into the well in his presence and started to jar; that he returned almost every day for several days, and that they were jarring all the time. He testified to a number of details, including the fact that they had inserted the granite or marble whipstock and that they had put cement into the hole to permit going around the obstruction which had been whipstocked; that he later returned after the cement had hardened and that the crew was drilling, trying to get by the whipstock.

It is here to be recalled that in his original testimony he stated in great detail exactly what kind of operations took place on the Bradley-King well. He said that "we went down to the die collar and screwed off about a thousand feet" and then

ran into difficulties and had to jar. He testified as to the kind of blow obtained with the jar and as to the manner of getting the desired twist on the pipe and that after finishing the jarring "we sidetracked and started drilling again."

There are many parts of his testimony which show an attempt to avoid answering questions which might require an answer contrary to those previously made. It is to be noted here that the character of operations on the Acme well which he claimed to have seen and described in detail would not fit into the character of operations that would ordinarily take place in removing pipe from an abandoned well.

Flury and Lewis corroborated the testimony of Lundberg relating to obtaining the jar. Lewis corroborated Lundberg in stating that it was taken to the Acme well and there used. Without discussing in detail the testimony relating to this circumstance, we think that the Examiner of Interferences properly sized up this situation as follows: "* * * even Lewis, who is supposed to have brought it [the jar] to the well with Lundberg, keeps a sort of mental reservation as to whether or not it actually was a jar * * * and is emphatic in denying that he testified that he knew the jar was run * * *."

Alleged facts relating to the use of the jar were also testified to by Loftin, Jewell, J. E. Hall, George Hall, Ellis and Thompson. It is claimed by Wickersham that the record shows that the Halls did not see the jar. Jesse Hall testified that on April 17, 1931, he and his son, accompanied by McKelvey, Lewis and Clay Miller, were at the Acme well and saw two workmen working on the engine packing a gland. George Hall, the son, said that it was a party by the name of Hamblin who was doing some work on the engine. McKelvey and Miller did not testify. Hamblin died before the taking of the testimony. Jesse Hall at one time claimed the workmen were watchmen. Later he stated he merely noticed there were two people there, and that he was interested in seeing that some one was there so that the pipe, which belonged to him, would not be stolen.

Robert H. Cavett, who testified for Raymond in 1935 that he had seen the torque jar in operation on the Bradley-King well, testified in rebuttal for Wickersham that he was in error about the Bradley-King well and would change his testimony to have it refer not to the Bradley-King well but to the Acme well. Considerable has been said about the Cavett testimony. We have examined it carefully and find that it contains no statement as to the character of jar used or the operation which was being performed other than that jarring was being done. He was ordered from the rig and his observations for the most part took place from an automobile 100 or 200 feet from the place where he claimed the operations were being performed.

Upon reopening the case, Wickersham introduced the payroll of the men who had worked on the Acme well until it was shut down on April 12. It shows that their pay ended at that time. Wickersham's Exhibit X–23 has been termed an "oil contract." Under the terms of the same the men working on the well agreed to accept part of their pay in oil, if produced. Appellants point out that the men might have continued after April 12 to work under the oil contract without receiving actual money. Concerning this document the Examiner of Interferences properly, we think, said:

"* * * In passing, it may be noted that if this contention were correct, the signatures to the contract would indicate that there would be a formidable array of possible witnesses to testify as to the alleged work after that date.

"This oil agreement bears the signature of Clarence Crane of whom McCullough's brief states on page 15, 'On the morning of the 12th (of April) at five o'clock (Wickersham R. 229) he left for Susanville and did not return to Venice until May 18th or 19th'. The agreement also bears the signature of Womack who left with Clarence Crane. Accordingly, it seems highly improbable that they signed the oil contract on or after April 12, 1931 to continue work on the well, and their testimony that they signed the contract before they went to work in March * * * appears far more reasonable than the hypothesis advanced by McCullough."

There are statements and documentary evidence, not set out here, in the records of both parties which are relied upon to support their respective contentions, but we see no useful purpose in unduly lengthening this opinion by pointing out in all respects the various claimed inconsistencies and the alleged contradictory portions of the testimony, nor is it necessary to discuss or refer to many of the documentary exhibits. The record contains nearly 5,000 pages and the briefs of the parties contain 195

and 170 pages, respectively. The Examiner of Interferences has discussed in great detail the various documentary exhibits and contentions of the parties and for the most part we are in entire agreement with his expressed views thereon.

■ Appellants contend that under the order of the Examiner of Interferences, the burden was upon Wickersham to show that the jar in controversy was not and could not have been used on each of the wells referred to. It seems to be the position of appellants that under the order of the Examiner of Interferences the burden shifted to Wickersham who in order to be awarded priority in the controversy must positively prove the reverse of what the law requires of the junior party. The burden resting upon appellee was that which ordinarily attends one introducing rebuttal testimony.

Wickersham moved to strike out a large portion of the Raymond and McCullough surrebuttal testimony on the ground that, if competent at all, it should have been introduced as evidence in chief and that appellants in urging it here are trying, in effect, to establish a new and unalleged date of test and to offer and urge the consideration of testimony which he, Wickersham, has had no opportunity to refute. The challenged testimony was never stricken and concerning it the Examiner of Interferences said: "The motion to strike, previously referred to, is believed to be meritorious in regard to the improper rebuttal testimony for McCullough, but it will not be formally granted because it has been thought desirable to consider the issues raised by such testimony. As to the other portions of the motion, it is believed that a detailed consideration thereof would unduly prolong the decision, although the objections raised have been considered in determining the weight to be given the testimony. The motion, accordingly, will be denied without prejudice."

He, however, fully analyzed and considered all the evidence Wickersham had sought to strike.

The board with respect to the evidence offered by Raymond and McCullough which Wickersham sought to strike had the following to say:

"Examination of the original record of Raymond and the rebuttal submitted by Wickersham and the new record submitted by Raymond and licensee McCullough discloses that, what should be the surrebuttal of Raymond and McCullough extends to new and previously unasserted facts.

"We shall consider the new testimony of Raymond and McCullough only to the extent that is within the bounds specified by the Examiner of Interferences in reopening."

■ In this court appellants have assigned 22 reasons of appeal. Some of them are of a character which by reason of our conclusion it is unnecessary to repeat or consider. Others are obviously so unimportant or without merit as to call for no extended discussion. On the first point raised relating to the burden on the part of Wickersham after the case was reopened, it is sufficient to say that we know of no authority where, under circumstances comparable to those at bar, the junior party was relieved from proving his case by a preponderance of the evidence. The burden continued to rest upon appellants to satisfactorily prove conception and successful tests of the device in controversy, and if the testimony as a whole fails so to do, an award of priority cannot be granted thereon. We think that the testimony falls far short of proving appellants' case. The most that can be said for appellants' record is that from it it may be concluded that some kind of jar or some kind of device at some time was used by some one on the Acme well. The proof relied upon by appellants is so questionable and indefinite as relating to the character of jar used, the time of its use and the object sought to be accomplished, that it is wholly unsatisfactory. By concurring decisions the tribunals below have so regarded it and we are not convinced that they were in error in their findings.

Aside from the contradictory phases of the evidence produced by appellants and the untruthful portions thereof, it is weak in the fact that at the institution of the proceeding it seems apparent from Raymond's preliminary statement and the course of his actions in connection with the interference that he originally relied solely for reduction to practice on happenings that took place in Bakersfield in 1930. He had definitely stated in his preliminary statement as follows: "E. That he first embodied his invention in a full-sized device, which was completed about the 24th day of November, 1930, and that on or about the 24th day of November, 1930, the said device was first successfully

tested in the City of Bakersfield, County of Kern, and State of California."

No mention was there made of any other activity in connection with reduction to practice. During the course of taking the testimony, Raymond claims to have learned of Lundberg's use of the Raymond jar on the Acme and Bradley-King wells. After the Bakersfield test it seems that the jar was out of Raymond's hands—possibly stolen—and went through the hands of the Globe Oil Company and then was delivered by it to Frank Halfen of the Shull Perforating Company, where Lundberg is said to have obtained it and later used it on one well which he admits had ceased operation and on another, the use upon which, to say the least, is questionable. It thus appears that a wholly different set of circumstances is relied upon than was disclosed in the preliminary statement, which is a circumstance which we think weakens appellants' record as a whole. The facts that the jar was twice stolen and never produced in evidence and that much of the testimony concerning its use is by witnesses who by reason of the nature of their employment would know little about the operations of the same certainly add no strength to the record.

As will be seen from the review of the testimony hereinbefore given, the testimony of some of the witnesses should be branded as a shameful mishandling of the truth. The testimony of other witnesses seems to be inspired by a disposition to truthfully state all they knew. Certain portions of the testimony, it seems. to us, produce a sordid picture of a lack of regard of the duty and responsibility devolving upon witnesses and litigants in proceedings of the character at bar, and we feel justified in condemning such practice in the strongest terms consistent with the facts.

■ The manner in which interference testimony is taken and a number of other facts not necessary to state here afford opportunity and sometimes are responsible for perjured evidence finding its way into the record. Such occurrences tend to destroy confidence in the whole patent system. It is the duty of litigants and their counsel to guard against such happenings and when the existence of such perjured testimony is discovered to quickly disavow any reliance upon it. It has been pointed out by the Examiner of Interferences that even after the testimony of some of the witnesses was discovered to have been false, it was not changed in subsequently filed affidavits and that the appellants, when opportunity was offered during their vigorous opposition to the motion to reopen the case, declined to admit that the testimony relating to the Bradley-King well was absolutely false.

■ Appellants in their reasons of appeal seek to present the contention here that Wickersham is not the real inventor of the jar in controversy but that his device is the invention of one Burns. It is well settled law that as between adversaries in an interference case it is of no avail for one to insist that the invention which the other claims was in effect not made by his adversary but by a third person. Cooper v. Hubbell, 53 F.2d 1072, 19 C.C.P.A., Patents, 790; Derby et al. v. Whitworth, 62 F. 2d 368, 20 C.C.P.A., Patents, 791.

Appellants here complain of the action of the Patent Office tribunals in their consideration of the surrebuttal testimony and in effect assert that it was not given consideration. It is our opinion that they treated appellants' surrebuttal testimony with as much, if not more, consideration than it was entitled to. Regardless of what they thought of its competency, they gave it consideration and of this fact appellants should not complain. Wickersham would seem to be the only one who had the right to complain on this score, and since he won below it was not necessary for him to make complaint here.

■ While appellants have assigned error against the board's finding that Raymond although first to conceive did not use due diligence from a period just prior to Wickersham's entering the field until Raymond filed his application, they have not pressed that point here. It is obvious, however, that no diligence whatever is disclosed by the record on the part of Raymond or McCullough at the time of or immediately prior to Wickersham's entering the field—February, 1931—or during the period after the alleged Acme operations in the spring of 1931 until the Raymond application was filed May 23, 1933.

■ Appellants seek to have the case remanded under certain circumstances for the taking of more testimony. Whether it be for the purpose of producing newly discovered evidence is not disclosed. We find no merit in this suggestion.

Every other reason of appeal submitted by the appellants has been given careful

consideration, and we find them without merit.

Upon the suggestion by appellee of a diminution of the record, on certiorari certain additional parts of the record were certified to this court by the Patent Office. Our order provided that the costs incident thereto should be subsequently taxed by us. Upon inspection of these papers so certified, we conclude that they were reasonably necessary to the proper disposition of the issues, as embodied in the reasons of appeal and the arguments in the brief of appellants. Therefore, the costs of printing the additions to the record will be taxed against appellants.

The decision of the Board of Appeals, awarding priority of the invention defined in the ten counts at bar to Wickersham, is affirmed.

Affirmed.

GARRETT, Presiding Judge, did not participate in this decision.